**WO**

1
2
3
4
5

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

9  Tami Ayala, mother of Dustin Shamblin,)    No. CV-07-8105-PHX-NVW
   Deceased,                            )
10                                      )    **ORDER**
            Plaintiff,                  )
11                                      )
   vs.                                  )
12                                      )
                                        )
13 Mohave  County,  Arizona,  an  Airzona)
   Political Subdivision; Tom Sheahan in his)
14 capacity  as  Mohave  County  Sheriff;)
   Mohave   County   Sheriff's   Office,   a)
15 separate Political Entity; Deputy Hartmann)
   and Jane Doe Hartmann, individually and)
16 as  husband  and  wife;  Sergeant  John)
   Wilson and Jane Doe Wilson, individually)
17 and as husband as wife,               )
                                        )
18          Defendants.                 )
                                        )
19 _____)

20

21          On October 29, 2006, at approximately 2:25a.m., Dustin Shamblin ("Shamblin")

22 was struck by a vehicle and killed as he walked along a rural highway.  His mother,

23 Plaintiff Tami Ayala ("Ayala"), brought this suit under 42 U.S.C. § 1983 against Mohave

24 County Sheriff's Deputy Kevin Hartmann and Sergeant John Wilson (collectively "the

25 Officers").  The Officers left Shamblin along the highway after they arrested the driver of

26 the vehicle he had been traveling in and impounded the vehicle.  Ayala claims that they

27 violated Shamblin's substantive due process rights under the Fourteenth Amendment to

28 the United States Constitution and were negligent under Arizona tort law.  The Defendant

1   Officers, Mohave County, the Mohave County Sheriff's Office, and the Mohave County

2   Sheriff now move for summary judgment.  (Doc. # 77.)  They also move to strike Ayala's

3   proposed expert for failure to disclose in accordance with Fed. R. Civ. P. 26(a).

4   **I. Background**

5        On Defendants' motion for summary judgment, the court views the evidence in the

6   light most favorable to Ayala and accepts the version of all disputed facts most favorable

7   to her.  *Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 n.1 (9th Cir. 2003).  At

8   approximately 1:25a.m., Sergeant Wilson began following a vehicle that he observed

9   traveling 44 miles per hour in a posted 35 mile per hour zone in Mohave County,

10  Arizona.  The vehicle turned onto Highway 95 and Sergeant Wilson observed it weaving

11  moderately within its lane.  He then initiated a traffic stop and made contact with the

12  driver, Regina Guarisco ("Guarisco").  Sergeant Wilson immediately smelled the odor of

13  alcohol and asked Guarisco if she had been drinking.  She said that she had drunk half a

14  beer.  Sergeant Wilson noted that her eyes were red and glassy and her speech was

15  noticeably slow and deliberate.  He asked her to step out of the vehicle.  Guarisco's

16  diver's license showed that she was under the legal drinking age of 21 and a preliminary

17  breath test indicated she had a blood alcohol concentration of .151%, which is above the

18  Arizona limit for Extreme DUI.  Sergeant Wilson moved Guarisco to a raised dirt surface

19  on the side of the road and began administering several Standardized Field Sobriety Tests.

20       During the process of investigating Guarisco, Deputy Kevin Hartmann arrived in a

21  separate patrol vehicle.  Sergeant Wilson asked Deputy Hartmann to speak with the

22  passenger of the vehicle and arrange to have the vehicle towed.[1]  Deputy Hartmann

23  walked to the passenger-side door of the vehicle and asked Shamblin for his driver's

24  license.  The deputy then asked whether Shamblin had been drinking and Shamblin

25

26

27       [1]Arizona State law and Mohave County Sheriff's Office policy mandated that the
     vehicle be impounded because Guarisco was under the legal drinking age and had committed
28   Extreme DUI.  A.R.S. § 28-3511.

1   replied in the affirmative.  When the deputy asked how much and what he had been

2   drinking, Shamblin was evasive and spoke in a low tone.

3        Meanwhile, Sergeant Wilson arrested Guarisco, put her in his patrol car, and

4   walked over to where Deputy Hartmann and Shamblin were talking.  Sergeant Wilson

5   asked Deputy Hartmann if Shamblin had been drinking.  Sergeant Wilson had previously

6   cited Shamblin for having an open container in a vehicle.  Neither Sergeant Wilson nor

7   Deputy Hartmann performed any sobriety tests on Shamblin to determine his level of

8   intoxication.  No urgent police business or departmental policy prevented the Officers

9   from providing Shamblin with a ride.  Nevertheless, Sergeant Wilson instructed Deputy

10  Hartmann, "we're not going to give him a ride . . . let him walk."  Sergeant Wilson

11  returned to his vehicle.

12       Deputy Hartmann instructed Shamblin to exit the vehicle and asked whether he

13  could call someone to pick him up.  Shamblin replied that he did not know anyone in the

14  area and asked the deputy for a ride.  Deputy Hartmann said that he could not provide a

15  ride.  He never offered to call a taxi cab for Shamblin.  He instructed Shamblin to leave

16  the area on foot, but to stay away from the roadway and walk in the dirt along the

17  roadway.  Shamblin went and stood on the raised dirt area on the side of the road, but

18  after some time returned and again asked Deputy Hartmann for a ride.  The deputy

19  repeated his instruction to leave the area on foot, which Shamblin did, traveling

20  northbound on the raised dirt area next to the road.

21       The stretch of Highway 95 where Shamblin was walking was extremely dark that

22  night.  There were no street lights.  Combined with the dark colored clothing that

23  Shamblin was wearing, it would have been very difficult for a driver to see him.

24  Highway 95 has two lanes traveling north and two lanes traveling south and is open to use

25  by vehicles, bicycles, and pedestrians.  The speed limit is 55 miles per hour.  To reach the

26  next commercial facility, Shamblin would have had to walk approximately three miles to

27  the north or south in extremely dark conditions.  He did not have his cell phone, which

28  contained all of his phone numbers.

1    Shamblin was struck and killed by a vehicle traveling northbound in the right

2    traffic lane approximately one-quarter to one-half a mile from the location of the traffic

3    stop.  Less than one-half hour had elapsed since Deputy Hartmann ordered Shamblin to

4    leave the area on foot.  At the time of the collision, Shamblin's blood alcohol

5    concentration was .208%.  The Officers had received training on the assessment of the

6    signs of alcohol and drug intoxication, the proper conduct of traffic stops, and the conduct

7    of Driving Under the Influence ("DUI") investigations.

8    **II.  Legal Standard for Summary Judgment**

9    Fed. R. Civ. P. Rule 56(c) provides that summary judgment is proper when "the

10   pleadings, depositions, answers to interrogatories, and admissions on file, together with

11   affidavits, if any, show that there is no genuine issue as to any material fact and that the

12   moving party is entitled to a judgment as a matter of law."  A "genuine issue" of material

13   fact will be absent if, "viewing the evidence and inferences which may be drawn

14   therefrom in the light most favorable to the adverse party, the movant is clearly entitled to

15   prevail as a matter of law."  *Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308, 1310 (9th

16   Cir. 1977); *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1111 (9th Cir. 2001).

17   Summary judgment is not appropriate when the nonmoving party identifies or produces

18   evidence from which a reasonable juror, drawing all inferences in favor of the nonmoving

19   party, could return a verdict in the nonmoving party's favor.  *United States v. Shumway*,

20   199 F.3d 1093, 1103–04 (9th Cir. 1999).

21   **III.  Qualified Immunity**

22   In suits pursuant to § 1983, police officers receive qualified immunity for their

23   official actions.  Qualified immunity shields government officials from liability "insofar

24   as their conduct does not violate clearly established statutory or constitutional rights of

25   which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

26   (1982).  The first step in a qualified immunity analysis is to determine "based upon the

27   facts taken in the light most favorable to the party asserting the injury, did the officer's

28   conduct violate a constitutional right?"  *Johnson v. County of L.A.*, 340 F.3d 787, 791 (9th

1   Cir. 2003).  "If there was a constitutional violation, 'the second inquiry is whether the
2   officer could nevertheless have reasonably but mistakenly believed that his or her conduct
3   did not violate a clearly established constitutional right." *Id.* at 791–92.  The Officers
4   assert a qualified immunity defense against Ayala's substantive due process claim under
5   the Fourteenth Amendment.

6   **A. Violation of Shamblin's Constitutional Rights**

7   State action violates the guarantee of due process "where the state action
8   'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action
9   creates or exposes an individual to a danger which he or she would not have otherwise
10  faced." *Kennedy v. Ridgefield City*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting
11  *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989))
12  (alteration in original).  To be liable under this state-created danger doctrine, a state actor
13  must have (1) affirmatively placed the plaintiff in danger that he otherwise would not
14  have faced, and (2) acted with deliberate indifference to that known or obvious danger by
15  subjecting the plaintiff to it.  *Id.* at 1062 (citing *Munger v. City of Glasgow*, 227 F.3d
16  1082, 1086 (9th Cir. 2000) and *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

17  **1. State-Created Danger**

18  Police officers have no absolute duty to provide transportation to the passenger of
19  a vehicle after arresting the driver.  *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993)
20  ("[Police officers] need not ferry stranded passengers who would otherwise be
21  inconvenienced, absent a rare combination of factors that turns the inconvenience into a
22  real and obvious danger.").  However, the police may not strand the passenger if to do so
23  would expose the passenger to a danger he otherwise would not have faced.  *Wood v.*
24  *Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989).  In *Wood*, our circuit held that a state
25  trooper affirmatively placed a vehicle passenger in danger by arresting the intoxicated
26  driver, impounding the vehicle, and abandoning the passenger in a high-crime area.  *See*
27  *also White v. Rochford*, 592 F.2d 381, 384–85 (7th Cir. 1979) (holding that it violated
28  substantive due process for an officer to leave several children alone in a car along a busy

1    highway on a cold night after arresting the driver).  This case is similar.  The Officers

2    arrested Guarisco for DUI, impounded her vehicle, and stranded Shamblin on the

3    shoulder of an extremely dark highway miles from the next commercial establishment.

4           The shoulder of a remote, dark highway can be exceedingly dangerous for a

5    pedestrian.  The Officers maintain that there was a sufficiently level, raised dirt area to

6    the side of the road where Shamblin could safely walk, but there is conflicting evidence

7    regarding the condition and extent of that path.  Ayala testified that it does not extend all

8    the way to town.  There is no evidence regarding the existence or condition of the raised

9    dirt area at the location where Shamblin was struck.  A reasonable juror could conclude

10   that the circumstances—the darkness, the distance, Shamblin's dark clothing, and his

11   drunkenness—made the highway a place of great danger for Shamblin.  That Shamblin

12   died less than one-half hour after parting company with Deputy Hartmann speaks to the

13   danger inherent in the situation.

14          The Officers also argue that, as a matter of law, they did not imperil Shamblin

15   because they removed him from the danger posed by his driver, who was intoxicated.  In

16   *Wood*, our circuit held that the officer could not strand a passenger in a high-crime area

17   even though the driver was intoxicated.  Here, as in *Wood*, it is possible to conclude that

18   the Officers removed Shamblin from one danger only to expose him to a different danger

19   that he "otherwise would not have faced."  *Kennedy*, 439 F.3d at 1061.  Nor does

20   speculation about who Shamblin may have been able to call for a ride remove this case

21   from the province of the jury.  Police officers who expose a person to danger through

22   their own actions cannot avoid liability by speculating about the person's ability to dodge

23   the bullet.  *See Munger*, 227 F.3d at 1086 ("In examining whether an officer affirmatively

24   places an individual in danger, we do not look solely to the agency of the individual, nor

25   do we rest our opinion on what options may or may not have been available to the

26   individual.").

27          Of course, if the person faces no new danger at the end of the encounter with the

28   officers, then the officers cannot be held liable for subsequent decisions of the person that

1  lead to injury.  For example, in *Foy v. City of Berea*, 58 F.3d 227 (6th Cir. 1995), police

2  officers ejected two drunk men from a college campus.  The men got into their car and

3  approximately one hour and many miles later got into a car accident that killed one of

4  them.  In concluding that the officers had not affirmatively endangered the men, the court

5  emphasized that the men themselves chose to "undertake the long journey back to

6  Crestline, Ohio" after leaving campus.  *Id.* at 231.  The officers did not leave the men

7  exposed to a new danger and they could not be held liable for the subsequent decisions

8  that lead to injury.  *See also Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th

9  Cir. 2003) (holding police officers not liable when an intoxicated man that they took from

10 the side of the highway to an open convenience store later wandered into traffic).

11         To conclude that Shamblin's danger was of his own making would require one to

12 ignore several of the most salient facts in this case.  Shamblin did not choose to walk

13 along the highway in complete darkness; he repeatedly pleaded with the Officers for a

14 ride.  Nor was his walking on the pavement a volitional act; it was dark, he was heavily

15 drunk, and it was a long way to town.  A reasonable inference is that conditions in the dirt

16 on the side of the road were so unfavorable or difficult to discern in the dark that he was

17 naturally impelled to the surer footing of the roadway.  Construing the facts and drawing

18 all reasonable inferences in favor of Ayala, a reasonable juror could conclude that the

19 Officers' actions, not Shamblin's independent choices, exposed him to a danger that he

20 otherwise would not have faced.

21                    **2. Deliberate Indifference**

22         "'Deliberate indifference' is a stringent standard of fault, requiring proof that a

23 municipal actor disregarded a known or obvious consequence of his actions."  *Kennedy*,

24 439 F.3d at 1064 (quoting *Bryan County v. Brown*, 520 U.S. 397, 410 (1997)).  An

25 officer's gross negligence is not enough to establish a due process violation.  Rather, the

26 officer must have subjected a person to a danger that was "known, or so obvious as to

27 imply knowledge."  *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996).

28         The Officers argue that Shamblin appeared sober and that they therefore did not

1    recognize the danger posed by the roadway.  However, cases where the victim of a police

2    officer's constitutional violation have died "'pose a particularly difficult problem' in

3    assessing whether the police acted reasonably, because 'the witness most likely to

4    contradict [the officers'] story . . . is unable to testify.'"  *Gregory v. County of Maui*, 523

5    F.3d 1103, 1107 (9th Cir. 2008) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.

6    1994)).  Courts in such cases must "carefully examine all the evidence in the record," and

7    deny summary judgment to police officers where the jury might conclude from

8    circumstantial evidence that the officers' testimony is not credible.  *Id.* (citing *Santos v.

9    Gates*, 287 F.3d 846, 852 (9th Cir. 2002)).

10        In this case, the only witnesses available to testify about Shamblin's demeanor at

11   the time of the incident are the Officers.  Guarisco could not have observed the Officers'

12   interactions with Shamblin because Sergeant Wilson moved her away from the vehicle to

13   perform field sobriety tests and then placed her in his patrol car.  The available

14   circumstantial evidence potentially casts doubt on the Officers' testimony that Shamblin

15   appeared sober.  For instance, Officer Wilson was immediately able to smell alcohol on

16   Guarisco, whose blood alcohol concentration was far less than Shamblin's.  Officer

17   Wilson had previously cited Shamblin for an alcohol related offense.  Shamblin admitted

18   that he had been drinking, evaded most of Deputy Hartmann's questions, spoke in a low

19   tone, and was traveling late at night in a car with an intoxicated, underage driver.

20   Viewing this evidence in the light most favorable to Ayala, reasonable jurors could

21   conclude that the Officers must have known that Shamblin was not sober.

22        The evidence can also support the conclusion that the Officers knew about and

23   consciously disregarded the danger of making Shamblin walk.  Despite Shamblin's pleas

24   for a ride, Sergeant Wilson callously replied, "let him walk."  There were two police cars

25   at the scene and the Officers had no urgent police business that prevented them from

26   providing Shamblin with a ride.  Recognizing the danger, Deputy Hartmann warned

27   Shamblin to stay out of the road and walk in the dirt.  Alternatively, reasonable jurors

28   could conclude that the danger presented by abandoning Shamblin on the shoulder of a

1  remote highway in complete darkness was exceedingly obvious.  The evidence can

2  support a jury verdict that the Officers were deliberately indifferent to the known or

3  obvious consequences of their actions—a collision that killed Shamblin.

4  **B. The Right Violated Was Clearly Established**

5  "[I]n order to find that the law was clearly established . . . we need not find a prior

6  case with identical, or even 'materially similar' facts.  Our task is to determine whether

7  the preexisting law provided the defendants with 'fair warning' that their conduct was

8  unlawful."  *Kennedy*, 439 F.3d at 1065 (citing *Flores v. Morgan Hill Unified Sch. Dist.*,

9  324 F.3d 1130, 1136–37 (9th Cir. 2003)).  In other words, "existing case law must have

10  made it clear that the conduct violated constitutional norms."  *Id.* at 1065–66.  "If officers

11  of reasonable competence could disagree on the issue [whether a chosen course of action

12  is constitutional], immunity should be recognized."  *Brewster v. Bd. of Educ.*, 149 F.3d

13  971, 977 (9th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (alteration

14  in original).

15  "It is well established . . . [that] the state's failure to protect an individual against

16  private violence . . . violate[s] the guarantee of due process . . . where state action creates

17  or exposes an individual to a danger which he or she would not have otherwise faced."

18  *Kennedy*, 439 F.3d at 1061 (citing *DeShaney*, 489 U.S. at 197).  Almost two decades ago,

19  *Wood* made clear that in our circuit the police may not abandon the passenger of a vehicle

20  after arresting the driver if to do so would expose the passenger to a new and manifest

21  danger.  879 F.2d at 590.  The Court of Appeals for the Seventh Circuit has followed a

22  similar rule for even longer.  *See White*, 592 F.2d at 384–85.

23  *Foy v. City of Berea*, 58 F.3d 227 (6th Cir. 1995), casts no doubt on these

24  precedents such that reasonable officers could be mistaken about the extent of the

25  constitutional right at issue.  There, the court stated, "Neither the Supreme Court nor this

26  court has announced a clearly established right of persons not in custody or incarcerated

27  to recover for a substantive due process violation because the police permitted them to go

28  on their way after a brief encounter."  *Id.* at 232.  But as explained earlier, *Foy* stands for

1   the unremarkable proposition that if the police do not affirmatively expose a person to

2   danger, they cannot be held liable for injury caused by the person's own subsequent

3   decisions.  No reasonable officer could believe that Shamblin himself chose to walk.

4        Furthermore, subsequent to *Foy*, our circuit decided *Munger v. City of Glasgow*

5   *Police Department*, 227 F.3d 1082 (9th Cir. 2000).  The police officers in *Munger* ejected

6   an intoxicated man from a bar wearing only a t-shirt in sub-freezing temperatures and

7   watched him walk away from nearby open establishments.  The court denied the officers'

8   motion for summary judgment because they had affirmatively placed the man in a

9   position of danger and were aware of that danger.  *Id.* at 1087.  In another decision

10  subsequent to *Foy*, the Court of Appeals for the Third Circuit held that police officers

11  violated substantive due process by separating a severely drunk woman from her husband

12  and then allowing her to walk home alone.  *Kneipp v. Tedder*, 95 F.3d 1199, 1203 (3d

13  Cir. 1996).  These cases underscore that police officers cannot disregard obvious dangers

14  that their own actions impose on those under the influence of alcohol, no matter how

15  legitimate the officers' initial intervention.

16       The dangers of remote, unlit highways to pedestrians who have been drinking are

17  obvious.  *See Cartwright*, 336 F.3d at 493 (calling the shoulder of a dark, foggy, two-lane

18  highway "a place of great danger" for a pedestrian under the influence of alcohol); *Davis*

19  *v. Brady*, 143 F.3d 1021, 1025–26 (6th Cir. 1998) (finding a violation of due process

20  when the officers left a person who had been drinking "outside the Flint city limits and

21  abandoned him on a dark and dangerous highway in an unfamiliar area"); *Wyatt v.*

22  *Krzysiak*, 82 F. Supp. 2d 250, 254 (D. Del. 1999) (noting that the officer received a one

23  day suspension for "leaving a woman alone on the side of a road late at night in a remote

24  area").  No reasonable officer would believe that the law permits the abandonment of a

25  person known to have been drinking along the shoulder of an extremely dark highway,

26  miles from the next safe haven.  The Officers are not immune from this suit.

27  **IV.  Municipal Liability**

28

1    To maintain an action against a municipality under § 1983, a plaintiff must allege

2  that his constitutional rights were violated by a policy, practice, or custom of the

3  municipality.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).  Ayala

4  contends that Sheriff Sheahan and the Mohave County Sheriff's Office failed to train the

5  Officers on how to handle passengers when arresting a driver and impounding the

6  vehicle.  "A municipality's failure to train an employee who has caused a constitutional

7  violation can be the basis for § 1983 liability where the failure to train amounts to

8  deliberate indifference to the rights of persons with whom the employee comes into

9  contact."  *Long v. County of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of

10  Canton v. Harris*, 489 U.S. 378, 388 (1989)).  To show deliberate indifference on behalf

11  of the municipality, the plaintiff must show (1) "[t]he continued adherence by

12  policymakers 'to an approach that they know or should know has failed to prevent

13  tortious conduct by employees;'" or (2) that a violation of constitutional rights "is a

14  highly predictable consequence of a failure to equip law enforcement officers with

15  specific tools to handle recurring situations."  *Id.* (quoting *Bd. of the County Comm'rs v.

16  Brown*, 520 U.S. 397, 407 (1997)).  Ayala cites no evidence of a pattern of Mohave

17  County Sheriff's officers stranding passengers known to have been drinking along remote

18  stretches of highway.  Nor is it highly predictable that officers would do so without

19  specific training on the subject.  This single incident is not enough to hold Mohave

20  County, Sheriff Sheahan, or the Sheriff's Office liable under § 1983.

21  **V.  Negligence**

22    Defendants briefly argue that they should be granted summary judgment on

23  Ayala's  negligence claims because the Officers owed Shamblin no duty of care.  They

24  cite only two Arizona cases, *Badia v. City of Casa Grande*, 195 Ariz. 349, 988 P.2d 134

25  (Ct. App. 1999), and *Hederick v. State*, 23 Ariz. App. 111, 530 P.2d 1144 (1975).  Neither

26  case contains any facts or discussion helpful to deciding whether Arizona law recognizes

27  a police officer's duty of care to a specific person who the officer has affirmatively

28  endangered through the officer's own action.  Defendants cite a more pertinent case from

1  another jurisdiction, *Holdson v. State of Maryland*, 637 A.2d 871, 879 (Md. Ct. App.

2  1994) (officers have no duty of care to intoxicated passenger when driver arrested).

3  Ayala cites contrary authority from yet another jurisdiction, *Walsh v. Town of*

4  *Cheektowaga*, 237 A.D.2d 947, 654 N.Y.S.2d 912 (N.Y. Ct. App. 1997) (officers have a

5  duty of care to intoxicated passenger when driver arrested).

6          Since this is an issue of Arizona law the task is to follow the decisions of

7  Arizona's highest court or predict how that court would resolve the issue.  *Dimidowich v.*

8  *Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986).  At least one Arizona decision has

9  recognized that a police officer has a duty of care toward a specific person where the

10  officer's action causes injury to that person, such as by exposing him to injury by third-

11  parties.  *McGeorge v. Phoenix*, 117 Ariz. 272, 277, 572 P.2d 100, 105 (Ct. App. 1977)

12  (citing *Gardner v. Village of Chi. Ridge*, 128 Ill. App. 2d 157, 262 N.E.2d 829 (1970)).

13  Defendants' scant authority provides no indication that Arizona does not or would not

14  recognize a duty in this case.  Their motion for summary judgment on the negligence

15  claim is denied.

16          Defendants also attack the sufficiency of Ayala's notice of claim, which must

17  contain, inter alia, "a specific amount for which the claim can be settled[,] and the facts

18  supporting that amount."  A.R.S. § 12-821.01(A).  They argue that Ayala's notice of

19  claim did not present facts supporting her settlement offer.  That is factually incorrect.

20  Ayala's notice of claim informed Defendants that she is Shamblin's mother, that she was

21  bringing a suit for the wrongful death of her son, and that she was in contact with her son

22  on a daily basis.  The law does not require the claimant to include "sufficient" facts to

23  support the settlement amount.  *Backus v. State*, ___ P.3d ___, 2008 Ariz. App. LEXIS

24  111 at *16, 2008 WL 2764601 at *5 (Ct. App. July 17, 2008).  It is sufficient if it contains

25  "*any* facts to support the proposed settlement amounts, regardless of how meager."  *Id.* at

26  *23, 2008 WL 2764601 at *7.  In this case, it is enough that the State understood that

27  Plaintiff is Shamblin's mother, that they had an ongoing relationship, and that she is

28  seeking compensation for her loss.  *Id.* at *24, 2008 WL 2764601 at *7–8 (stating that in

1    a wrongful death suit "it was enough for the State to understand that Backus was a

2    surviving adult child and was seeking compensation for the death of her father").

3    **VI.  Punitive Damages**

4    　　　Under Arizona law, "[n]either a public entity nor a public employee acting within

5    the scope of his employment is liable for punitive or exemplary damages."  A.R.S. § 12-

6    820.04.  To the extent that Ayala's complaint encompasses a claim for punitive damages

7    under Arizona law, Defendants will be granted summary judgment in their favor.

8    However, "a jury may be permitted to assess punitive damages in an action under § 1983

9    when the defendant's conduct is shown to be motivated by evil motive or intent, or when

10   it involves reckless or callous indifference to the federally protected rights of others."

11   *Smith v. Wade*, 461 U.S. 30, 34 (1983).  Ayala may therefore seek punitive damages

12   against the Officers under § 1983.

13   **VII.  Evidentiary Issues**

14   　　　Defendants objected to some of Ayala's statements of fact.  In reaching its

15   conclusion on this motion, the court did not find it necessary to rely on any of the factual

16   assertions to which Defendants had objected.  However, one of those objections requires

17   a response from the Court at this time.

18   　　　Defendants objected and moved to strike the proposed testimony of Joe Collier,

19   Ayala's expert in toxicology, under Fed. R. Civ. P. 37(c).  Under that rule, a party is not

20   allowed to use an undisclosed expert witness unless the failure to disclose was

21   substantially justified or harmless.  Ayala first disclosed this expert on January 4, 2008 in

22   his First Supplemental Rule 26.1 Disclosure Statement.  (See Doc. # 27.)  In that

23   document Ayala disclosed her intent to call Mr. Collier, who would testify to Shamblin's

24   likely blood alcohol content at the time of his interaction with the Officers and that "[h]e

25   would be a lot drunker than [Guarisco]."  That disclosure certainly did not fulfill all the

26   requirements of Fed. R. Civ. P. 26(a)(2).  Nor did her subsequent Expert Disclosure

27   Statement, submitted after the deadline set by the case management order, which simply

28   listed the name, address, and a one line summary of the expected testimony of three

1   expert witnesses.  (Doc. # 76.)  Ayala would now, after the close of discovery, like to

2   submit her full expert disclosure statement and call Mr. Collier as a witness.  Her attorney

3   was reportedly ill during the time that the expert disclosure came due.  However, the

4   attorney's illness was not the cause of the failure to disclose, for the attorney's partners

5   were handling the case in his absence, and upon his return he filed his formal, but still

6   deficient, Expert Disclosure.  Furthermore, to allow Ayala to call Mr. Collier would

7   necessitate the reopening of discovery and would prejudice the Defendants, who relied on

8   the case management order in conducting discovery and constructing their case.  As

9   Ayala's neglect was not substantially justified or harmless, she will not be allowed to call

10  Mr. Collier or any other expert witness in this case.

11          IT IS THEREFORE ORDERED that Defendants' motion for summary judgment

12  (Doc. # 77) is granted with respect to Count IV and Ayala's claims for punitive damages

13  under Counts I and II.  The motion is denied in all other respects.

14          IT IS FURTHER ORDERED that Defendants' motion to strike (Doc. # 83)

15  Ayala's expert witness Joe Collier is treated as an objection to Collier's expert opinion

16  testimony, and the objection is sustained.

17

18                  DATED this 7th day of November, 2008.

19

20  _____

21                  Neil V. Wake
                United States District Judge

22

23

24

25

26

27

28

- 14 -